IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAMMY RODGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:21cv00858 |
| | ) |
| MIDLAND CREDIT MANAGEMENT, INC., | ) |
| TRANSUNION LLC, | ) |
| EQUIFAX INC., | ) |
| EQUIFAX CREDIT INFORMATION | ) |
| SERVICES INC., | ) |
| INNOVIS DATA SOLUTIONS INC. | ) |
| EXPERIAN INFORMATION SOLUTIONS, | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT

AND NOW COMES Plaintiff Sammy Rodgers, by and through his undersigned counsel, and files this, his Complaint against Midland Credit Management Inc.:

### parties

1. Plaintiff is Sammy Rodgers ("Rodgers"), an individual.

2. Defendant Midland Credit Management Inc. ("MCM"), is a Kansas Corporation that operates as a collection agency.  MCM maintains a commercial registered office in Pennsylvania at ℅ Corporation Service Company in Dauphin County, Pennsylvania, and has registered with the Pennsylvania Secretary of State as a foreign corporation operating in Pennsylvania.

3. Defendant TransUnion LLC is a Delaware Limited Liability Company. TransUnion maintains a commercial registered office in Pennsylvania at ℅ the Prentice Hall Corporation System Inc.  in Dauphin County, Pennsylvania, and

has registered with the Pennsylvania Secretary of State as a foreign corporation operating in Pennsylvania.

4. Defendants Equifax Inc. and Equifax Credit Information Services Inc. are both Georgia corporations. Both corporations maintain a commercial registered office in Pennsylvania at % the Prentice Hall Corporation System Inc. in Dauphin County, Pennsylvania, and have registered with the Pennsylvania Secretary of State as a foreign corporation operating in Pennsylvania.

5. Defendant Innovis Data Solutions Inc. is a Missouri corporation. Innovis maintains a commercial registered office in Pennsylvania at % Corporation Service Corp. in Dauphin County, Pennsylvania, and has registered with the Pennsylvania Secretary of State as a foreign corporation operating in Pennsylvania.

6. Defendant Experian Information Solutions Inc. is an Ohio corporation. Experian maintains a commercial registered office in Pennsylvania at % CT Corporation System in Dauphin County, Pennsylvania, and has registered with the Pennsylvania Secretary of State as a foreign corporation operating in Pennsylvania.

7. Collectively, the enterprises collectively referred to in paragraphs 3 through 6 are referred to herein as the "consumer reporting agency defendants."

**jurisdiction**

8. This Court maintains jurisdiction over this action pursuant to 28 USC 1331 as it is based on the identified federal statutes cited herein. In addition, this Court may grant declaratory judgment and injunctive relief pursuant to 28 USC 2201 and 28 USC 2202.

**venue**

9. Venue is proper in the Western District of Pennsylvania pursuant to 28 USC 1391(b)(1) as each of the defendants reside in the Commonwealth of Pennsylvania and in the Western District of Pennsylvania.

10. More specifically, each of the defendants are residents pursuant to 28 USC 1391(c)(2) because they are each an entity with the capacity to sue and be sued in its common name and are deemed to reside in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to this civil action.

11. Clearly, by establishing a commercial registered office in Pennsylvania and registering to conduct business in Pennsylvania, each defendant is subject to the personal jurisdiction of this Court.

12. As to the district, venue is proper pursuant to 28 USC 1391(d). Specifically, each of the defendants are deemed to reside in the Western District of Pennsylvania because their contacts would be sufficient to make it subject to personal jurisdiction if that district were a separate state.

13. Indeed, Midland Credit Management Inc. collects debts from thousands of consumers in the Western District of Pennsylvania, contacts them by telephone and mail in the district on a routine basis, and files lawsuits against consumers as a debt collection agency in the Western District of Pennsylvania on a routine basis.

14. Similarly, the consumer reporting agency defendants maintain files on thousands of consumers in the Western District of Pennsylvania, sell that information to businesses in the Western District of Pennsylvania, and have more than minimal contacts by mailing letters and correspondence, entering

contracts in, and generally conducting business in the Western District of Pennsylvania.

### Factual Background

15. Plaintiff applied for, received, and maintained a Mastercard account with Capital One Bank ending in the number 4734.

16. As the account was branded a Mastercard, in addition to normal credit card terms, it was subject to the Mastercard Zero Liability Policy. Specifically, with a Mastercard, issuers represent that customers, "Have peace of mind knowing that the financial institution that issued your Mastercard won't hold you responsible for 'unauthorized transactions.' As a Mastercard cardholder, Zero Liability applies to your purchases made in the store, over the telephone, online, or via a mobile device and ATM transactions."

17. During the maintenance of the account with Capital One, Plaintiff noticed various charges he did not authorize on the account. He notified Capital One verbally and in writing.

18. Capital One, instead of resolving the issue or complying with the Mastercard Zero Liability Policy, sold the account to Midland Credit Management Inc. Based on information, Midland Credit Management does not request dispute information from Capital One in connection with the purchase, but only statements listing the charges regardless of whether they were authorized.

19. Midland Credit Management Inc. assigned various reference numbers to the account including 20-119876, 2493954, 342832112, XXXXX8918, P15 T405, 003, and original creditor account number XXXXXXXXXXXX4734.

20. By purchasing the account, Midland Credit Management Inc. also was required to comply with the Mastercard Zero Liability Policy.

21. Based on information, Plaintiff disputed the account with Midland Credit Management Inc. and with the consumer reporting agency defendants.

22. Based on information, the consumer reporting agency defendants notified Midland Credit Management Inc. of the dispute.

23. Based on information, MCM simply "verified" the account by noting that it was in the name of Sammy Rodgers, something that was never disputed.

24. Based on information, the consumer reporting agency defendants accepted this so-called "verification" as investigation results.

25. In October 2020, MCM filed a lawsuit against Plaintiff claiming that he owed them for the Capital One credit card that they purportedly purchased.

26. Rodgers did not know about the lawsuit until foreign-based agents of Midland, who falsely Americanized their names to conceal their location, verbally mentioned the proceedings.

27. Based on information, Rodgers again disputed the debt with Midland Credit, notifying them that he did not authorize the charges.

28. On August 13, 2021, Midland Credit caused their lawsuit to be dismissed. However, they continued to report the debt to the consumer reporting agency defendants.

29. After the lawsuit dismissal, Rodgers again disputed the account with the consumer reporting agency defendants and Midland.

30. Based on information, the consumer reporting agency defendants either refused to conduct an additional investigation and/or notified Midland Credit of the dispute to which Midland simply verified the account again without investigating the claim of unauthorized charges.

31. In mid-2022, Rodgers again disputed the debts with the credit reporting agency defendants advising that the charges were not authorized and that Capital One did not process the dispute.

32. Based on information, the credit reporting agency defendants notified Midland Credit of the dispute, but again only required it to verify the ownership of the account and not the specific information.

33. In mid-2022, Rodgers asked the federal Consumer Financial Protection Bureau to notify the consumer reporting agency defendants and Midland Credit of the dispute. Based on information, the CFPB notified the consumer reporting agency defendants and Midland Credit of the dispute.

34. A justiciable controversy exists as to whether the consumer reporting agencies and Midland Credit Management Inc. are complying with their obligations under federal law by not performing a full and adequate investigation and only requiring Midland Credit Management verify the ownership of the account rather than the underlying dispute as to the validity of the charges.

**COUNT I – For Declaratory and Injunctive Relief as to the Fair Credit Reporting Act**

35. Paragraphs 1 through 34 are hereby incorporated by reference and are realleged as if fully set forth again.

36. Congress enacted the Fair Credit Reporting Act to ensure fair and accurate credit reporting. In pursuit of this goal, the Act imposes a host of requirements concerning the creation and use of consumer reports.

37. The FCRA creates a private right of action against consumer reporting agencies for the negligent, see 15 U.S.C. § 1681o, or willful, see 15 U.S.C. § 1681n, violation of any duty imposed under the statute.

38. Section 1681e(b) of the FCRA states, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

39. In this case, the consumer reporting agencies included inaccurate information in Plaintiff's credit reports, specifically, by reporting the amount Midland Credit claimed was owed notwithstanding that it did not reduce the amount for the unauthorized charges despite receiving notice.

40. The inaccuracy was due to the defendants' failure to follow reasonable procedures to assure maximum possible accuracy. Specifically, the defendants simply allowed Midland Credit to state that the account was verified based on its cursory review of the name and identifiers on the account, notwithstanding that it did not investigate the claim that the charges were not authorized.

41. Plaintiff is suffering an injury. Specifically, the credit report continues to show the inaccurate information about the amount of the alleged debt owed to Midland Credit.

42. The injury was caused by the inclusion of the inaccurate entry.

43. Section 1681i(a) of the FCRA generally requires a consumer reporting agency to, after receiving notice from a consumer that the consumer disputes the accuracy of an item, "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file." 15 U.S.C. § 1681i(a)(1)(A).

44. Plaintiff's consumer report contains inaccurate and incomplete information by including the alleged debt to Midland Credit Management.

45. Rodgers repeatedly notified the credit reporting agency defendants of the inaccuracy and the specifics of the dispute.

46. The dispute was not frivolous or irrelevant. On the contrary, the charges– not the account itself– were not authorized and were subject to reimbursement.

47. The agencies did not respond or conduct a reasonable investigation of the disputed items. On the contrary, they allowed Midland Credit to simply verify the existence of the account and the account ownership. The agencies did not verify information about the charges or whether they were authorized.

48. The failure to reinvestigate caused Plaintiff's credit score to be lowered, increased the cost of his borrowing, and resulted in multiple denied loan applications including credit cards and a small business administration economic loan.

49. The consumer reporting agency defendants negligently failed to "maintain and/or follow reasonable procedures to assure maximum possible accuracy of the information it reported to one or more third parties pertaining to [Plaintiff]."

50. As stated above, the information on the credit reports was not accurate because it showed amounts due for the disputed charges.

51. The policies and procedures of the consumer reporting agency defendants were and are unreasonable in that they allow the reporting company to "verify" the information based on simply confirming the match of the account holder rather than reviewing the specific information that the charges, not the account, were unauthorized.

52. As to Midland Credit, it also had obligations under the Fair Credit Reporting Act. Specifically, it violated 15 USC 1681s-2(b) of the Act which

requires entities that furnish information to the consumer reporting agency defendants to investigate disputed information.

53. When a consumer disputes information with a CRA, the CRA must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A).

54. As part of this investigation, the CRA is required to notify the person or entity that furnished the information that the information has been disputed. Id. § 1681i(a)(2).

55. Upon receipt of this notice, the furnisher of information must: (1) "conduct an investigation with respect to the disputed information"; (2) "review all relevant information provided by the [CRA]" in connection with the dispute; and (3) "report the results of the investigation to the [CRA]." Id. § 1681s-2(b)(1).

56. Should the investigation determine that the disputed information is "inaccurate or incomplete or cannot be verified," the furnisher must "as appropriate, based on the results of the reinvestigation promptly ... modify[,] ... delete [or] permanently block the reporting" of that information to CRAs. Id. § 1681s-2(b)(1)(E).

57. The CRAs must also delete or modify the information based on the results of reinvestigation. Id. § 1681i(a)(5)(A)(I).

58. In this case, at a minimum, Midland Credit needed to do more than simply verify that identity of the accountholder and whether the charges were on the bill. Rather, it needed to investigate whether the charges actually occurred, were unauthorized, or whether the Plaintiff disputed the charged with Capital One.

59. Midland failed to conduct any real investigation into Plaintiff's claims that the charges were not authorized or that he made a dispute to Capital One.

60. Midland's investigation, if any, was insufficient to satisfy § 1681s-2(b).

61, The duty of a furnisher under § 1681s-2(b) is a component of the larger reinvestigation duty imposed by § 1681i(a) on CRAs themselves. See id. § 1681s-2(b)(2) (requiring furnishers to complete their investigation and report its results "before the expiration of the period ... within which the [CRA] is required to" resolve the dispute).

62. § 1681i(a) imposes "a duty ... to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer."

63. Midland Credit investigation was not reasonable as it did not focus on the information in the disputes Plaintiff made but considered only non-relevant information such as whether the account itself was authorized.

64. Section 1681s-2(b) contemplates three potential ending points to reinvestigation: verification of accuracy, a determination of inaccuracy or incompleteness, or a determination that the information "cannot be verified." See 15 U.S.C. § 1681s-2(b)(1)(E).

65. Midland did not verify the actual charges for accuracy.

66. Because the plain text of § 1681s-2(b) requires furnishers of information to either "verif[y]" disputed information by means of "investigation," or inform the CRAs that the information "cannot be verified."

67. Since Midland Credit did not investigate whether the charges themselves were authorized, or whether Capital One complied with the dispute

procedures and Zero Dollar Liability Policy, it did not comply with 15 USC 1681s-2(b).

68. The ordinary meaning of "verification" is: (1) "evidence that establishes or confirms the accuracy or truth of something"; (2) "the process of research, examination, etc., required to prove or establish authenticity or validity"; (3) "a formal assertion of the truth of something, as by oath or affidavit"; and (4) "a short confirmatory affidavit at the end of a pleading or petition." *Haddad v. Alexander, Zelmanski*, Danner & Fioritto, PLLC, 758 F.3d 777, 782-83 (6th Cir. 2014) (quoting Random House Unabridged Dictionary 2113 (2d ed.1993)). "Verify" has a similar meaning in the legal context. See Black's Law Dictionary 1793 (10th ed. 2014) ("verify vb. (14c) 1. To prove to be true; to confirm or establish the truth or truthfulness of; to authenticate. 2. To confirm or substantiate by oath or affidavit; to swear to the truth of."). Finally, the term "investigation" is defined as "[a] detailed inquiry or systematic examination" or "a searching inquiry." *See* Am. Heritage Dictionary 920 (4th ed. 2000); Webster's Third New Int'l Dictionary 1189 (1981)).

69. Based on the above, § 1681s-2(b) requires some degree of careful inquiry by furnishers of information. In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s-2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as "verified."

70. Midland did not look beyond the information contained in the files, never contacted Capital One, did not request the signed sales receipts, and never attempted to determine whether Plaintiff approved the charges.

71. Section 1681s-2(b) does not impose an unduly burdensome investigation requirement on furnishers; rather, it presents them with a choice

regarding how they handle disputed information. The first option is to satisfy § 1681s-2(b) by conducting an investigation, verifying the disputed information, and reporting to the CRAs that the information has been verified. Verification might be accomplished by uncovering documentary evidence that is sufficient to prove that the information is true, which Midland Credit did not do.

72. Alternative, Midland Credit could have accomplished the requirements by relying on personal knowledge sufficient to establish the truth of the information.

73. The second way for a furnisher to satisfy § 1681s-2(b) is to conduct an investigation and conclude, based on that investigation, that the disputed information is unverifiable. Furnishers can avail themselves of this option if they determine that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire. Having made such a determination, furnishers are entitled to cease investigation and notify the CRAs that the information "cannot be verified." See 15 U.S.C. § 1681s-2(b)(1)(E). When a furnisher reports that disputed information "cannot be verified," the question of whether the furnisher complied with § 1681s-2(b) turns on whether the furnisher reasonably determined that further investigation would be fruitless or unduly burdensome.

76. However, Midland Credit did not notify the consumer reporting agency defendants that the information cannot be verified as that would have resulted in its removal from Plaintiff's credit report. On the contrary, Midland Credit repeatedly and continuously places the account on Plaintiff's credit report each month.

77. The final way to satisfy § 1681s-2(b) is to conduct an investigation and conclude that the disputed information is "inaccurate or incomplete." Id.

78. Midland Credit did not report that the information was inaccurate or incomplete. Rather, it appears to have reported the information as verified without reviewing the specifics of Plaintiff's dispute.

79. This framework reflects the fact that § 1681s-2(b) is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information.

80. When a furnisher determines that disputed information is false or "cannot be verified," the furnisher must notify the CRAs of this result pursuant to § 1681s-2(b)(1). The furnisher must also "as appropriate, based on the results of the reinvestigation promptly... modify[,] ... delete [or] permanently block the reporting" of that information to CRAs. Id. § 1681s-2(b)(1)(E).

81. What "the results of the reinvestigation" require may vary depending on the nature of the disputed information.

82. However, one thing is clear, Midland Credit did not attempt to investigate whether the charges themselves were authorized, did not contact Capital One to see if a dispute was lodged and the results thereof, and definitely did not comply with the Zero Liability policy.

83. Clearly, because the consumer reporting agency defendants and Midland Credit simply "verified" the account based on non-relevant information (such as that the identifiers of the account belonged to Plaintiff), and did not investigate the actual dispute (that Plaintiff did not authorize the charges and that Capital One did not process the dispute), the defendants did not comply with the Fair Credit Reporting Act.

WHEREFORE, Plaintiff Sammy Rodgers demands that this Court enter a declaratory judgment that the dispute and investigation procedures of the defendants do not comply with the Fair Credit Reporting Act and that the

defendants be enjoined from further violations of the Fair Credit Reporting Act including a requirement that Plaintiff's dispute be fully and thoroughly investigated or that they remove the account or balance owing from the consumer reports, along with judgment for costs and reasonable attorney fees for prosecuting this action.

    Respectfully submitted,

*/s/ J. Allen Roth, Esq*
J. Allen Roth, Esq. (PA ID 30347)
805 S Alexandria Street
Latrobe PA  15650
(724) 686-8003
federal@jarothlaw.com

ATTORNEY FOR SAMMY RODGERS